[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an administrative appeal to the Superior Court by the plaintiff, Hartford Municipal Employees Association (HMEA), brought pursuant to General Statutes § 4-183, from a decision of the defendant, Connecticut State Board of Labor Relations (Labor Board). The Labor Board's decision (Decision), dated February 25, 1997, hearing No. 3471, was on a complaint of HMEA against the defendant City of Hartford (City). HMEA had alleged that the City violated the Municipal Employee Relations Act (MERA) by refusing to implement a contract previously agreed to by the parties. This appeal was timely filed as were the briefs of the parties, and oral argument was heard on October 20, 1998.
The Labor Board's decision was subsequent to three days of hearings conducted on May 20 and 21, and July 29, 1996. At the hearings, the parties presented evidence, examined and cross examined witnesses, and made arguments. Both HMEA and the City filed post hearing briefs and reply briefs before the Labor Board's decision was rendered.
In its decision, the Labor Board made the following findings of fact:
 1. The Union is an employee organization within the meaning of the Act.
 2. The City is a municipal employer within the meaning of the Act.
CT Page 13828
 3. The City and the Union were parties to a collective bargaining agreement (contract) effective from July 1, 1991 to June 30, 1994. (Ex. 1)
 4. Negotiations for a successor collective bargaining agreement were initiated in March, 1994.
 5. On May 12, 1994, the parties agreed to a set of ground rules in a document entitled "Memorandum of Understanding". (Ex. 2)
 6. Paragraph 6, of the "Memorandum of Understanding" provides that; "All tentative agreements shall be reduced to writing and signed by the chief spokesperson at the time they are recorded or at a date no later than the next scheduled meeting between the parties."
 7. Paragraph 7 of the "Memorandum of Understanding" states, "All tentative agreements are subject to final agreement on all outstanding issues." (Ex. 2)
 8. The parties continued negotiations for a successor agreement during the period March, 1994 to May, 1995. (Ex. 2, 4, 5, 6 and 14)
 9. In the spring of 1995, the parties utilized the services of a mediator assigned by the State Board of Mediation and Arbitration (SBMA). This process did not produce an agreement.
 10. In June, 1995, the parties entered into binding interest arbitration on the remaining issues in dispute in accordance with the procedures of the SBMA.
 11. On August 29, 1995 representatives of the City and the Union attended a meeting regarding the unresolved issues for the successor contact. This meeting was called at the request of City Councilman, John O'Connell after discussions with Union members. The individuals in attendance at this meeting were the City Manager, Ms. Sandra Kee Borges and City Councilman, John O'Connell, Union President, Frank Horan, and Vice President Stuart Rabinowitz.
 12. Although the testimony of City and Union witnesses differ on precisely what issues were discussed at the August 29 CT Page 13829 meeting, their respective testimony reveals that certain issues were withdrawn, others rejected and others were agreed to in concept or principal.
 13. The evidence reveals that none of the issues agreed upon at the August 29th meeting were reduced to writing. However, the parties did agree that Ms. Borges would share the results of the meeting with Mr. Gordon Distin, the City's Chief Spokesperson, and have him produce written contract language on each of the issues on which an agreement had been reached. This written contract language was delivered by Distin to the City Manager on August 31th for her review. (Ex. 14)
 14. Borges reviewed the document, made revisions and discussed them with Distin.
 15. An interest arbitration hearing scheduled for August 30th
was canceled. The reason for the cancellation was to allow the parties the time to determine if agreement could be achieved on the issues discussed at the August 29th meeting.
 16. On September 5, 1995 Distin presented Horan with language he believed reflected the agreement reached on August 29, 1995. Also, on September 5, 1995, the City Treasurer made a presentation to the Union representatives on a proposed contact provision which concerns Section 415 of the Internal Revenue Code.[1] The Union did not agree to this proposal but told Distin that the Union would "advise" him on the proposed language on September 8th. (Ex. 15).
 17. On September 18 and 19, Distin and Horan met again. As a result, further written changes were made to the previous document at Horan's suggestion. In addition, the parties reached a salary adjustment for the position of Controller. On September 19, 1995, Distin wrote to Borges and informed her that a tentative agreement had been reached with Horan on September 18th. In this correspondence, Distin informed Borges that the Union was still awaiting a legal opinion on the IRS proposal put forth by the City. During this meeting, Distin told Horan that traditionally the parties used the date of contract ratified by the Union as the date of the agreement for purposes of submission to City's Council for acceptance or rejection.
 18. On September 29, Horan telephoned Distin at home CT Page 13830 requesting that the City waive a provision contained in Article III, Section 3 and 4 of the successor collective bargaining agreement. Specifically, Horan requested a waiver from the provision that increased employees co-payments for health insurance. Distin responded that he did not have the authority to make this change and that Horan should discuss this issue with the City Manager. It was Horan's position that the proposed successor agreement could not be accepted by the Union if the requested change was not made.
 19. Later that day, Ms. Borges called Distin to inform him that she had agreed to waive the provisions of the contract which would have increased the employees' contribution to health care. Distin then revised the language and on October 2, 1995, he met with Horan and discussed the revisions. These revisions were agreed to by Horan at that time.
 20. Also, at the October 2th meeting, Distin "reminded" Horan that in accordance with their prior practices with HMEA, ratification by the Union was the effective date of agreement.
 21. On October 2, 1995 the Union membership ratified the successor agreement. Horan called Distin to inform him of the ratification.
 22. On October 10, 1995 the proposed successor collective bargaining agreement was referred to the Hartford Court of Common Council. (Ex. 7)
 23. On October 13th, Distin notified the Chairperson of the interest arbitration panel that by mutual agreement the hearing dates for November 1, and November 6, 1995 were canceled, but that the hearing date for November 29th
remained in effect as scheduled. (Ex. 12)
 24. On November 8th the Operations and Budget Committee had a meeting to review the contract. The Committee lacked a quorum and referred the contract to the Council without a recommendation. (Ex. 13)
 25. On November 13, 1995, the Court of Common Council rejected the proposed successor collective bargaining agreement.
CT Page 13831
 26. On March 29, 1996, the parties appeared before the binding interest arbitration panel at which time the Union argued that an agreement had been reached between the parties on August 29, 1995 and that there was a valid collective bargaining agreement in effect by operation of § 7-474(b).
 27. Prior to the November 13, 1995 rejection of the agreement by the City's legislative body, the Union never asserted to the City's representatives that agreement was reached on August 29, 1995.
(Return of Record (ROR), Item 6, Decision No. 3471, pp. 2-4.)
In the present case, as correctly stated by the Labor Board, the plaintiff, in effect, raises two main issues: 1) whether the Labor Board was correct when it determined that the parties reached an agreement, as that term is used in General Statutes § 474(b), on October 2, 1995, and 2) whether the Labor Board was correct when it determined that the City Council had the authority to reject the proposed successor collective bargaining agreement.
It is clear that the scope of the court's review of an agency's decision is very restricted. Pet v. Dept. of HealthServices. 228 Conn. 651, 660 (1994). General Statutes § 4-183(j) provides that "[t]he court shall not substitute its judgment for that of the agency as to the weight of the evidence on the questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions or decisions are . . . clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record . . ."
Furthermore, "[j]udicial review of conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion . . ." (Citations omitted; internal quotation marks omitted.) Connecticut Light Power Co. v. Dept. of PublicUtility Control, 219 Conn. 51, 57-58 (1991). Similarly, "[w]ith regard to questions of fact, it is [not] the function of the trial court . . . to retry the case or to substitute its judgment CT Page 13832 for that of the administrative agency." Internal quotation marks omitted.) Id., 57. "The question is not whether the trial court would have reached the same conclusion but whether the record before the commission supports the action taken . . ." (Citations omitted.) Hospital of St. Raphael v. Commission onHospitals Health Care, 182 Conn. 314, 318 (1980).
Nevertheless, where "the issue is one of law, the court has the broader responsibility of determining whether the administrative action resulted from an incorrect application of the law to the facts found or could not reasonably or logically have followed from such facts. Although the court may not substitute its own conclusions for those of the administrative board, it retains the ultimate obligation to determine whether the administrative action was unreasonable, arbitrary, illegal or an abuse of discretion . . ." (Citations omitted.) United ParcelService Inc. v. Administrator, Unemployment Compensation Act,209 Conn. 381, 385-86 (1988). Further "[a]lthough the construction and interpretation of a statute is a question of law for the courts to decide . . . it is the well established practice of [the courts] to accord great deference to the construction given [a] statute by the agency charged with its enforcement." (Citations omitted; internal quotation marks omitted.) Starr v.Commissioner of Environmental Protection, 226 Conn. 358, 372
(1993).
A. The Labor Board's Determination That The Parties Reached An Agreement On October 2, 1995.
HMEA argues that an agreement was reached on August 29, 1995 because during that day's meeting the parties had a "meeting of the minds" as to the terms of the successor agreement. The subsequent changes to the agreement were modifications to effectuate the original agreement of August 29, 1995, or were typographical in nature. According to HMEA's argument, the "meeting of the minds" is the critical point of agreement which would start the time lines in the statute. If HMEA's argument is accepted and an agreement was reached on August 29, 1995, it follows that the City Council's rejection of the collective bargaining agreement on November 13, 1995 was untimely and would result in the automatic approval of the agreement pursuant to General Statutes § 7-474(b).[2]
The record reflects that on August 29, 1995, the City Manager, Sandra Kee Borges, and City Councilman John O'Connell CT Page 13833 met with Frank Horan, President of HMEA, and Stuart Rabinowitz, an HMEA negotiating committee member, to discuss the successor collective bargaining agreement. (ROR, Item 4, Transcript (Tr.) pp. 25, 122, 227.) The items discussed during the meeting included health insurance for retirees, wages, pensions, mileage reimbursement, parity increases for certain classifications, and compensatory time. (ROR, Item 4, Tr., pp. 126-27.) Those present at the meeting agreed, conceptually, to certain economic items to be included in the successor agreement, but no one reduced those agreements to writing nor proposed specific language of the items. (ROR, Item 4, Tr., pp. 129-30, 230, 244-45, 216-17, 257.) Mr. Horan, the President of HMEA, did not indicate or state that he believed a tentative agreement had been reached on August 29, 1995. (ROR, Item 4, Tr., p. 130.)
A draft writing containing the agreements of the parties was prepared by Gordon Distin, a consultant for the City of Hartford who negotiated contracts as the City Manager's representative and was the City's chief spokesperson in these negotiations. (ROR, Item 4, Tr., pp. 131-32, 333-34; Ex. 2, 14.) After changes to the language had been made by the City Manager and incorporated, the written document was given to the HMEA president on September 5, 1995. (ROR, Item 4, Tr. 334; Ex. 15.) HMEA and the City met and made changes to the proposed successor collective bargaining agreement on September 5, September 18 and 19, 1995. (ROR, Item 4, Tr. pp. 135-36; Ex. 14, 15, 16.) Additionally, there was a "continuing dialogue" between the HMEA president and the city's negotiator, consisting of telephone conversations and in person meetings, between September 5 and October 2, 1995. (ROR, Item 4, Tr., p. 335.) For example, prior to August 29, 1995, the parties had agreed that the contract language regarding co-pay for health insurance was going to "remain as it was." (ROR, Item 4, Tr., p. 128.) But on September 29, 1995, Mr. Horan contacted Mr. Distin and requested that the City consider waiving that provision. After several conversations, the City agreed, and Distin and Horan agreed to meet on October 2, 1995, to discuss the new contract language. (ROR, Item 4, Tr., pp. 338-40.) At the meeting on October 2, 1995, Horan stated that the language was acceptable to him and that it would be presented to the membership that evening at the HMEA ratification meeting. (ROR, Item 4, Tr., p. 341; Ex. 17.) The equity salary adjustments for the position of controller were not resolved and agreed to until September 19, 1995. (ROR, Item 4, Tr., pp. 420-27; Ex. 16.)
Stuart Rabinowitz, HMEA's vice president of finance and a CT Page 13834 member of HMEA's negotiating team, recalled a discussion and presentation by the City Treasurer concerning IRS tax implications on the pension fund language on September 5, 1995. (ROR, Item 4, Tr., pp. 252, 365-66.) The tax implications had not been discussed on August 29, 1995, and new language was being requested by the City and discussed on September 5, 1995. (ROR, Item 4, Tr., pp. 253-55.) The issues of appointment of arbitrators for grievances and visitation of work sites by union representatives were unresolved until September 5, 1995. (ROR, Item 4, Tr., pp. 373-74; Ex. 4, 5.)
HMEA here argues that a verbal agreement between the parties was sufficient, standing alone, to constitute a tentative agreement. Of course, Rule 6 of the May, 1994, Memorandum of Understanding between the parties states: "All tentative agreements shall be reduced to writing and signed by the chief spokespersons at the time they are reached, or at a date no later than the next scheduled meeting between the parties." (ROR, Item 4, Ex. 2.) HMEA claims that Rule 6 was waived because the parties did not adhere to it. That claim is contradicted by the record. As the testimony of Mr. Rabinowitz, HMEA's vice president, indicates, the agreements reached were subject to the language being put in writing, reviewed by HMEA and sometimes clarified, and then each word and all of the language agreed to by both sides. (ROR, Item 4, Tr., pp. 245- 46.) This procedure was corroborated by HMEA President Horan, City Manger Borges, and the City's chief negotiator Gordon Distin. (ROR, Item 4, Tr. pp. 103-04, 156-57, 342-43.)
Based upon the evidence, the Labor Board properly found that the parties agreed to use the ratification date by the HMEA as the date of the agreement for purposes of the time limitations contained within § 7-474(b). During their meeting on September 18, 1995, Mr. Distin reminded Mr. Horan that the date that HMEA ratified the proposed collective bargaining agreement traditionally would be used as the date of the tentative agreement for the purpose of submission to the Court of Common Council for acceptance or rejection. Mr. Horan agreed to the use of the ratification date. (ROR, Item 4, Tr. pp. 337-38.) On October 2, 1995, Distin and Horan met again, and Distin reminded Horan that in accordance with their earlier agreement, if HMEA ratified the agreement the date of the ratification would be the date of tentative agreement for purposes of General Statutes § 7-474(b). Again, Horan agreed to the use of the ratification date. (ROR, Item 4, Tr., p. 341.) Moreover, CT Page 13835 traditionally the City has utilized the ratification date by HMEA as the date of tentative agreement for collective bargaining purposes. (ROR, Item 4, Ex. 7, 21, 22, 23, 24, 25, 26, 27, 28, 30.) In the present case, the membership of HMEA met and voted to ratify the proposed collective bargaining agreement on October 2, 1995. (ROR, Item 4, Tr., pp, 58, 272-74.)
Before the Labor Board, HMEA consistently argued that an agreement was reached on August 29, 1995. For the first time during this administrative appeal, however, HMEA contends that an agreement was reached on either August 29, 1995, or September 29, 1995. The Labor Board contends that this court should not consider the "new" argument concerning September 29, 1995, based on General Statutes § 31-109(b). Section 31-109(b) provides that "no objection that has not been urged before the Board shall be considered by the court, unless the failure to urge such objection is excused because of extraordinary circumstances." Here, the plaintiff has failed to establish extraordinary circumstances for the failure to argue and brief the alternative date theory before the Board.
Notwithstanding the preclusion of the September 29, 1995, argument, the record contains substantial evidence which supports the Labor Board's conclusion that the parties reached an agreement on October 2, 1995 and not before.
"The substantial evidence rule governs judicial review of administrative fact finding under the UAPA. General Statutes § 4-183(j)(5) and (6). An administrative finding is supported by substantial evidence if the record affords a substantial basis of fact from which the fact in issue can be reasonably inferred . . . The substantial evidence rule imposes an important limitation on the power of the courts to overturn a decision of an administrative agency . . . and to provide a more restrictive standard of review than standards embodying review of weight of the evidence or clearly erroneous action . . ." (Citations omitted; footnote omitted; internal quotation marks omitted.) Dolgner v. Alander. 237 Conn. 272, 281 (1996). Substantial evidence "is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence . . ." (Citations omitted; internal quotation marks omitted.) Id. CT Page 13836
Thus, the Labor Board's determination that the parties reached an agreement, as that term is used in General Statutes § 7-474(b), on October 2, 1995, is fully supported by substantial evidence in the record.
B. The City Council's Authority to Reject the Proposed Collective Bargaining Agreement
The plaintiff argues that the collective bargaining contract was never lawfully rejected by the City Council. As correctly framed by the Labor Board, the question is whether the City submitted the agreement to the legislative body in accordance with General Statutes § 7-474(b). Section 7-474(b) provides as follows:
 Any agreement reached by the negotiators shall be reduced to writing. Except where the legislative body is the town meeting, a request for funds necessary to implement such written agreement and for approval of any provisions of the agreement which are in conflict with any charter, special act, ordinance, rule or regulation adopted by the municipal employer or its agents, such as a personnel board or civil service commission, or any general statute directly regulating the hours of work of policemen or firemen or any general statute providing for the method or manner of covering or removing employees from coverage under the Connecticut municipal employees' retirement system or under the policemen and firemen survivors' benefit fund shall be submitted by the bargaining representative of the municipality within fourteen days of the date on which such agreement is reached to the legislative body which may approve or reject such request as a whole by a majority vote of those present and voting on the matter, but, if rejected, the matter shall be returned to the parties for further bargaining. Failure by the bargaining representative of the municipality to submit such request to the legislative body within such fourteen-day period shall be considered to be prohibited practice committed by the municipal employer. Such request shall be considered approved if the legislative body fails to vote to approve or reject such request within thirty days of the end of the fourteen-day period for submission to said body. Where the legislative body is the town meeting, approval of the agreement by a majority of the selectmen shall make the agreement valid and binding upon the town and the board of finance shall appropriate or provide CT Page 13837 whatever funds are necessary to comply with such collective bargaining agreement.
As discussed above, the City and HMEA reached a tentative agreement on October 2, 1995, when HMEA approved the last issue reduced to writing between the parties, and HMEA ratified the agreement. The agreement was submitted to the City Council on October 10, 1995, and the Council rejected the agreement on November 13, 1995. Thus the City complied with the time requirements of § 7-474(b).
HMEA also argues that the City Council's vote of November 13, 1995, to reject the agreement was "null and void." The genesis of the argument is that on November 8, 1995, the Operations, Management and Budget Committee (OMB Committee) convened a special meeting to consider the agreement. But the OMB Committee lacked a quorum at its scheduled meeting and could not conduct its business. The OMB Committee referred the collective bargaining agreement without recommendation back to the City Council for consideration. (ROR, Item 4, Ex. 29.) HMEA contends that, under Robert's Rules of Order, the OMB Committee was powerless to take any action whatsoever in the absence of a quorum. The City concedes that Robert's Rules of Order determine the procedures of the Council in the absence of Council Rules. (ROR, Item 4, Tr., p. 310.) Robert's Rules of Order provide that, in the absence of a quorum, any business transacted is null and void, and the only action that legally can be taken in the absence of a quorum is to adjourn or to take measures to obtain a quorum. (ROR, Item 4, Tr., pp. 316-19.) According to the argument then, the referral back to the City Council without a recommendation was procedurally improper and the rejection of the agreement by the Council on November 13, 1995, was invalid.
HMEA's procedural argument is unavailing. General Statutes § 7-474(e) provides that the procedures in the MERA for making an agreement "shall be the exclusive method" and any provisions in any charter to the contrary shall not apply. The provisions of MERA were complied with by the City Council's vote on November 13, 1995. The City Council's rejection of the proposed collective bargaining contract fully adhered to the mandates of General Statutes § 7-474(b). The Labor Board's determination in this regard was legally correct.
Based on the foregoing, the decision of the Labor Board is affirmed and HMEA's administrative appeal therefrom is dismissed. CT Page 13838
Michael Hartmere, J.